```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA        :     CRIMINAL ACTION
                                :     NO. 08-736-01
                                :
        v.                      :
                                :
RICHARD J. MARGULIES            :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                              June 9, 2010

## I. INTRODUCTION

On May 6, 2009 Defendant Richard Margulies ("Defendant"), pleaded guilty to one count of securities fraud and aiding and abetting, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2. The Court held hearings on December 8, 2009, and March 2, 2010. After considering the testimony of the Government's expert witness at these hearings, the exhibits received in evidence, and the written submissions of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

## II. FINDINGS OF FACT

A. Offense Conduct

1. Defendant was the chief financial officer and a director of Advatech, Inc. ("Advatech"), a West Palm Beach, Florida corporation that described itself as an early stage biotechnology company engaged in the research and development and the commercialization of non-invasive electrical therapies.

(Presentence Investigation Report "PSR" ¶ 10.)[1] Advatech stock was publicly traded under the ticker symbol "ADVA" on Pink OTC Markets Inc., an inter-dealer electronic and trading system in the over-the-counter ("OTC") securities market commonly referred to as the "Pink Sheets."  (Id.)

2. Defendant owned 1,475,380 shares of the 5.6 million outstanding shares of Advatech.  (Id.)

3. On May 21, 2008, Defendant met with Eduardo Rodriguez ("Rodriguez") and Kevin Waltzer ("Waltzer") to discuss a scheme to artificially inflate the price of Advatech stock.  (Id. ¶ 11.) At the time of this meeting, Waltzer was acting as a cooperating Government witness and surreptitiously recorded this conversation.  (Id.)  During this meeting, Defendant, Rodriguez, and Waltzer agreed that Defendants would pay Rodriguez and Waltzer to purchase and hold Advatech stock.  (Id.)  By generating these fraudulent purchases, Defendant would cause artificial demand in the Advatech stock and thereby drive the price up.  (Id.)

4. Defendant told Rodriguez and Waltzer that he personally owned approximately thirty (30) percent of Advatech's stock and that he otherwise controlled the "float" or free trading stock.

---

[1] The findings of fact recited herein are based on facts contained in the PSR which were not objected to by Defendant, facts which Defendant acknowledged as part of his guilty plea on May 6, 2009, and testimony and exhibits admitted at the hearings.

(Id.) With that level of control over the stock, Defendant would be in a position to make sure that when the fraudulent buying was occurring there would not be sellers in the market who would drive the price of the stock down. (Id.)

5. During the May 21, 2008 meeting, Defendant agreed to pay Rodriguez and Waltzer twenty (20) percent of the cost of the shares in Advatech stock that they, or individuals working with them, purchased and held as part of the scheme. (Id. ¶ 12.)

6. During this May 21, 2008 meeting, Defendant explained to Rodriguez and Waltzer that, in order to avoid regulatory or other scrutiny, he wanted to move Advatech's stock price up slowly. (Id.) Initially, Defendant said they should keep the price between $1.00 and $1.50 per share. (Id.) Defendant stated that he wanted Rodriguez and Waltzer to arrange for the purchase of approximately $150,000 to $250,000 of Advatech stock, but that these purchases should be spread out over time to avoid scrutiny. (Id.) Defendant stated that if he was able to raise funding through the stock purchase scheme of as little as $100,000 to $200,000, Advatech stock could be trading at $8.00 or $9.00 per share. (Id.) On May 21, 2008, the Advatech stock was trading at a share price of $.30.

7. Following the initial meeting, Defendant and Waltzer corresponded through a series of e-mails and over the telephone concerning the stock fraud scheme. (Id. ¶ 13.) On May 30, 2008,

Defendant e-mailed Waltzer a confidential list of shareholder positions in Advatech. (Id.) On June 2, 2008, Defendant told Waltzer in a recorded call that "our job is to have [sic], without too much difficulty, so that if we have to go to Plan B and they start putting money in they have to put it in at higher prices." (Govt.'s Proposed Findings of Fact and Conclusions of Law Ex. A, Transcript of June 2, 2008 telephone call.) On June 11, 2008, Defendant told Waltzer that an upcoming Advatech press release would announce an agreement with a major university and that they should "move [the stock] up nice and slow, so it doesn't look like we're a bunch of idiots." (PSR ¶ 13.)

8. On June 12, 2008, Defendant told Waltzer by telephone that he was issuing the Advatech press release on June 16, 2008, and that he expected it to create trading activity in Advatech stock. (Id. ¶ 14.) Defendant instructed Waltzer that he should make sure that the individuals who were purchasing stock as part of the scheme did not purchase Advatech stock until after the news was released, in order to avoid scrutiny. (Id.)

9. On June 16, 2008, prior to its public release, Defendant e-mailed Waltzer an Advatech press release announcing a research agreement with a major university. (Id. ¶ 15.)

10. On June 17, 2008, at approximately 2:00 p.m., Defendant telephoned Waltzer to inform him that the press release should be public by 3:00 p.m. and instructed him to purchase the Advatech

stock after that time. (Id.) Defendant agreed to wire Waltzer's fee after the trades cleared, but to conceal his involvement in the scheme, Defendant stated that he would make the payment from an account that was not his. (Id.)

11. Subsequent to this conversation, on June 17, 2008, Defendant telephoned Waltzer to inform him that the press release had not yet been issued and instructed Waltzer to refrain from purchasing Advatech stock until the next day because Defendant did not want buying "in the absence of news." (Id. ¶ 16.) A short time later, Defendant informed Waltzer that the press release was publicly available and that Waltzer should purchase the Advatech stock as they had agreed. (Id.) Defendant instructed Waltzer to send him wiring instructions for the negotiated fee. (Id.)

12. On June 17, 2008, Waltzer, at the direction of Defendant, caused purported retail purchases to be made of 1,000 shares of Advatech stock at a price of approximately $.90 per share for a total of $900. (Id. ¶ 17.) Those trades were settled using undercover funds of the Federal Bureau of Investigation. (Id.)

13. On June 18, 2008, Waltzer, at the direction of Defendant, caused purported retail purchases to be made of 4,100 shares of Advatech stock at a price of $1.00 per share, for a total of $4,100. (Id.) Those trades were also settled using

funds from the Federal Bureau of Investigation. (Id.)

  14. On June 19, 2008, Defendant discussed with Waltzer that he himself had bought shares of Advatech stock on June 18, 2008, in order to raise the share price to $1.00. (Id. ¶ 18.) Defendant confirmed that he would pay Waltzer the agreed-upon 20 percent fee, but stated that to help conceal the scheme, he would make payments in multiple transactions from different accounts. (Id.) Defendant and Waltzer agreed that Waltzer would compensate Rodriguez for his role in the fraudulent scheme. (Id.)

  15. On June 20, 2008, Defendant deposited into an undercover account maintained by the Federal Bureau of Investigation at a financial institution in Philadelphia, Pennsylvania, $520 as partial payment to Waltzer and Rodriguez for their buying activity in the fraudulent scheme. (Id. ¶ 19.) On June 20, 2008, Defendant requested by telephone that Waltzer send him a fake invoice to disguise the deposit that Defendant made to Waltzer's account. (Id.) Defendant instructed Waltzer to direct the invoice to a shell company that Defendant controlled. (Id.) Defendant also instructed Waltzer that in the future, to avoid detection, Waltzer should not communicate with him about the fraudulent scheme by e-mail. (Id.) On June 23, 2008, Defendant deposited an additional $520 to pay Rodriguez and Waltzer for the initial buying activity. (Id.)

  16. On December 15, 2008, Defendant was arrested, and after

being advised of his Miranda rights, consented to an interview. (Id. ¶ 20.)  During that interview, Defendant acknowledged that (1) he knew that it was illegal to pay Waltzer to cause the purchase of Advatech stock; (2) he paid Waltzer kickbacks for that unlawful buying from a separate company that Defendant controlled; and (3) he improperly provided Waltzer with non-public press releases.  (Id.)

    B.    Intended Loss

17.  The Government's expert witness, James Cangiano, is an expert in securities fraud with over 35 years of regulatory experience.  (Sentencing Hr'g Tr. 13-15 Dec. 8, 2009)  Mr. Cangiano is familiar with the techniques employed by market manipulators of micro-cap companies, such as Advatech, and the damages caused by such schemes.  (Id. 15.)

18.  Stock manipulators of micro-cap stocks generally defraud the market by inducing investment from the unsuspecting public through a variety of different methods, including the false appearance of an active market, matched trades, and the coordinated issuance of press releases.  (Id. 17-19.)  Such activity is detrimental to the financial markets because it erodes investor confidence.  (Id. 21.)

19.  Defendant controlled approximately 85 percent of the "float," or free-trading shares of Advatech.  (Id. 30.)  This enabled Defendant to control the supply, and, ultimately, the

price of Advatech stock by selling his group's stock through illegal prearranged trades with Waltzer. (Id. 30-31.) Defendant sought to inflate the share price from $.30 to at least $2.00 per share.

20. None of the actions taken by Defendant, Waltzer, or Rodriguez would have resulted in a direct capital investment to Advatech. (Id. 42.)

21. Defendant intended for the Advatech share price to be raised to at least $2.00 by execution of the fraudulent scheme. The monetary difference in the share price between the $.30 share price, as of May 21, 2008, and the target share price of $2.00 is $1.70. Based on the 1,475,380 shares owned by Defendant, and the $1.70 difference in share price, the intended loss that would have resulted from the fraudulent scheme was at least $2,508,146.[2]

C. Acceptance of Responsibility

22. Defendant entered a guilty plea to one count of securities fraud and aiding and abetting, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2, on May 6, 2009.

23. During the entry of this guilty plea, Defendant reserved the right to challenge the issue of the amount of

---

[2] This calculation of loss is as follows: 1,475,380 shares x $1.70 (amount of gain by raising the share price to $2.00 from $.30 per share) = $2,508,146.

intended loss under the Sentencing Guidelines during the sentencing phase of these proceedings.

24. The Court held two sentencing hearings to address the calculation of the intended loss issue. During these sentencing hearings, the Government presented expert witness testimony as to the issue of intended loss. Defendant did not provide any expert testimony in support of his intended loss calculation.

### III. CONCLUSIONS OF LAW

A. <u>Intended Loss Calculation</u>

1. The Government's investigation of Defendant involved a sting operation designed to apprehend Defendant in the act of manipulating Advatech stock while preventing the investing public and other intended victims from suffering actual economic loss. The proper test for calculating loss for sentencing purposes is whether Defendant intended that others actually suffer regardless of whether the attempted fraudulent scheme was impossible or unlikely to occur.

2. Defendant intended to inflate the share price of Advatech stock from $.30 per share to at least $2.00 per share. Defendant owned 1,475,380 shares of Advatech stock. Therefore, as Defendant's intended loss was at least $2,508,146, the applicable provision of the Sentencing Guidelines concerning Defendant's intended loss is U.S.S.G. § 2B.1(b)(1)(J).

B. <u>Acceptance of Responsibility</u>

3. Defendant is entitled to a reduction in offense level pursuant to U.S.S.G. § 3E1.1 since he has demonstrated acceptance of responsibility for his offense as he has admitted to the essential elements of the offense and assisted the Government in avoiding preparation of trial.

**IV. DISCUSSION**

A. <u>Intended Loss Calculation</u>

An increase in a defendant's base offense level under U.S.S.G. § 2B1.1 is determined by the financial loss caused by the fraud. The Sentencing Guidelines do not present a single universal method for loss calculation under § 2B1.1, rather, several possible approaches are to be employed depending on the circumstances. The Government bears the burden of establishing by a preponderance of the evidence that a sentencing enhancement applies. <u>United States v. Napier</u>, 273 F.3d 276, 279 (3d Cir. 2001).

Under the Sentencing Guidelines, "intended loss" means "the pecuniary harm that was intended to result from the offense." U.S.S.G. § 2B1.1 cmt. n.3 (A)(ii).[3] Pursuant to

---

[3] Application Note 3 to U.S.S.G. § 2B1.1 provides:

(A) General Rule.--Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss.

Application Note 3(A)(ii), "intended loss" also "includes pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance claim in which the claim exceeded the insured value)." Id. Furthermore, the Application Note provides that "[t]he court need only make a reasonable estimate of the loss" based on the fact that the "sentencing judge is in a unique position to assess the evidence and estimate the loss based upon the evidence." Id. cmt. n.3(c).

The Third Circuit addressed the issue of the calculation of "intended loss" in the fraud context in United

---

    (I) Actual Loss.--"Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.

    (ii) Intended Loss.--"Intended loss" (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

    (iii) Pecuniary Harm.--"Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.

    (iv) Reasonably Foreseeable Pecuniary Harm.--For purposes of this guideline, "reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.

Id. cmt. n.3.

-11-

States v. Geevers, 226 F.3d 186 (3d Cir. 2000). See also United States v. Kushner, 305 F.3d 194, 197 (3d Cir. 2002) (considering whether District Court erred in calculating intended loss of conspiracy by including face value of unused counterfeit checks where defendant withdrew from conspiracy before using those checks); United States v. Titchell, 261 F.3d 348, 352-53 (3d Cir. 2001) (determining that District Court's calculation of intended loss from mail fraud scheme was error where District Court equated potential loss with intended loss without "deeper analysis").

Geevers involved a defendant who had pleaded guilty to a check-kiting scheme who appealed the decision of the District Court on the ground that calculating the intended loss based on the face value of the deposited checks was error because he realistically could not have withdrawn the full face value of the fraudulently deposited checks. Geevers, 226 F.3d at 188-89. The Third Circuit established that "a district court errs when it simply equates potential loss with intended loss without deeper analysis," however, the court failed to elaborate on what such "deeper analysis" actually entails. Id. at 192. The court did make clear that "intended loss" is to be derived from the defendant's subjective expectation and not merely based on the risk of loss to which he may have exposed his victims. Id. (citing United States v. Yeaman, 194 F.3d 442, 460 (3d Cir.

1999)).

In order to discern a defendant's subjective intent, the District Court is permitted to "draw inferences from the nature of the crime he sought to perpetrate." Id. In Geevers, the Third Circuit held that the District Court could have inferred that the defendant intended to cause the full loss of the face value of the fraudulent checks because even if the defendant did not expect to be able to obtain the full face value of the checks, "[w]e believe that a sentencing court may plausibly conclude that a defendant like Geevers would likely have taken the full amount of the deposited checks if that were possible." Id. at 193.

Defendant objects to a sentencing enhancement based on a range of intended loss of $2.5 million to $7 million under U.S.S.G. § 2B.1(b)(1)(J). Defendant's position is that his offense cannot be characterized as a "pump and dump scheme" because he did not intend to "dump" the Advatech stock after raising the share price, therefore, a calculation based on the increase in share price multiplied by the number of shares he owned is erroneous. Instead, Defendant contends that his offense is limited to an illegal "kickback" transaction of the fraudulent scheme and that the $5,000 stock transaction, and corresponding $1,040 fee paid to Waltzer, should be the proper measures of intended loss. In other words, Defendant characterizes the

-13-

scheme as one intended to raise capital for Advatech, which also included a an illegal kickback component, but contends that it is not a classic "pump and dump" scheme.

The Court disagrees. Defendant's position that this scheme cannot qualify as a "pump and dump" scheme and is limited only to inducing capital investment is untenable. Defendant was recorded specifically discussing his plan to inflate the share price of Advatech to at least $2.00 to $3.00. Defendant specifically told his co-conspirators that he personally owned approximately 30 percent of Advatech's stock and that he otherwise controlled the "float" or free trading stock and that "nobody's doing nothing [with the stock] we don't know about." (PSR ¶ 11.) Defendant also explained to the purchasers that he wanted to move the stock price up slowly to avoid regulatory detection and indicated that the stock purchases should be spread out over time to avoid scrutiny. (Id. ¶ 12.) With respect to an impending positive press release that was expected to generate interest in the stock, Defendant stated that the stock should "move up nice and slow, so it doesn't look like we're a bunch of idiots." (Id. ¶ 13.) Mr. Cangiano, the Government's expert witness, testified that each of these actions is wholly consistent with a course of conduct comprising a "pump and dump scheme."

Consistent with the teachings of Geevers, the Court is

permitted to draw reasonable inferences as to Defendant's subjective intent based on the circumstances of his crime. The Court concludes that the facts to which Defendant pleaded guilty, when viewed in light of Mr. Cangiano's expert testimony, demonstrate that Defendant intended to inflate the Advatech price to at least $2.00 per share and that the intended goal of this scheme was an eventual "dump" of his personally held Advatech stock in order to realize a pecuniary gain.

It is true that Defendant did express a desire to induce approximately $100,000 to $200,000 of outside capital investment in Advatech. The evidence in this case, however, does not demonstrate that this capital investment was Defendant's singular goal in completing the artificial stock inflation, rather than one component of the overall plan to inflate the price of the stock for an eventual dump. In other words, Defendant has failed to point to evidence of record to demonstrate that any intent to obtain capital investment in Advatech was mutually exclusive from his intent to sell his stock at the artificially inflated price. Critical to the Court's conclusion is Mr. Cangiano's expert testimony that an expression of intent to induce capital investment into a company is consistent with the practice of a "dump and pump" scheme and that none of the actions to which Defendant pleaded guilty would have

resulted in a direct capital investment in Advatech.[4] (Sentencing Hr'g Tr. 37, 42 Dec. 8, 2009.) Therefore, the Government has presented sufficient facts to prove by a preponderance of the evidence that Defendant intended to sell the Advatech stock after fraudulently inflating the price above $2.00, thereby triggering application of U.S.S.G. §2B.1(b)(1)(J).

    B.   Acceptance of Responsibility

The Government asserts that Defendant is ineligible for a 3 level adjustment on his offense level for acceptance of responsibility under U.S.S.G. § 3E1.1.[5] The Government contends Defendant has failed to "clearly demonstrate[] acceptance of responsibility for his offense" because Defendant refuses to acknowledge his full participation in the "pump and dump" scheme by contesting the intended loss calculation. The Government's position is that Defendant's dispute over the intended loss calculation necessitated a type of "mini-trial" which required

---

[4] The Court notes that Defendant elected not to present expert testimony in support of his theory despite ample opportunity to do so.

[5] During the entry of Defendant's guilty plea, the Government conceded that he had entered his plea in a timely fashion such that he was entitled to a 3 level adjustment under U.S.S.G. 3E1.1(a), (b). (Sentencing Hr'g Tr. 19 May 6, 2009.) Therefore Subsequent to Defendant's challenge concerning the calculation of the intended loss calculation, the Government changed its position and argued that Defendant was not entitled to any reduction for acceptance of responsibility. Therefore, the Court will limit its decision only to the issue of whether Defendant is entitled to a 3 level reduction or no reduction at all.

-16-

the presentation of evidence supporting the underlying elements to which Defendant pleaded guilty.

Section 3E1.1(a) of the Sentencing Guidelines permits a reduction of a defendant's sentence "if the defendant clearly demonstrates acceptance of responsibility for his offense."[6] U.S.S.G. § 3E1.1. Furthermore, section 3E1.1(b) provides for an additional one level reduction where a "defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently."[7] Id. The question of whether a defendant has "accepted responsibility" is a factual determination to be made by the District Court. United

---

[6] The statute states as follows: "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." Id.

[7] The statute provides as follows:

[i]f the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level.

Id.

States v. DeLeon-Rodriguez, 70 F.3d 764, 767 (3d Cir. 1995). A defendant is required to prove by a preponderance of the evidence that a reduction in sentence is warranted under this provision. Id.

It is true that a guilty plea does not create an automatic entitlement to a reduction for acceptance of responsibility. United States v. Singh, 923 F.2d 1039, 1043 (3d Cir. 1991) ("[A] plea of guilty is not dispositive as to the defendant's acceptance of responsibility."); United States v. Ortiz, 878 F.2d 125, 128 (3d Cir. 1989). Courts have recognized that an acceptance of responsibility adjustment is not appropriate where a defendant refuses to accept his criminal role in a transaction by contesting the underlying facts. See Ortiz, 878 F.2d at 128 (affirming district court's refusal to grant acceptance of responsibility adjustment where defendant presented facts that attempted to minimize his role in a criminal enterprise and did accept responsibility for "the role that the physical, the tangible, the unquestioned facts demonstrate that he held"); United States v. Walker, 69 F. App'x 546, 549 (3d Cir. 2003) (upholding District Court's denial of acceptance of responsibility adjustment where defendant pleaded guilty to drug possession with intent to distribute but subsequently requested an independent test of the composition of the drugs); see also U.S.S.G. § 3E1.1 comment 1(a) (stating that "a defendant who

-18-

falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility").

It is equally true, however, that a defendant retains the ability to defend his offense level computation under the Sentencing Guidelines without forfeiting the reduction for acceptance of responsibility.  See e.g., U.S.S.G. § 3E.1.1 cmt. n.1(a) (instructing that a defendant has acted in a manner inconsistent with acceptance of responsibility where he "falsely denies, or frivolously contests, relevant conduct that the court determines to be true") (emphasis added); United States v. McIntosh, 198 F.3d 995, 1009 (7th Cir. 2000) (recognizing that a defendant is entitled to pursue an issue unrelated to factual guilt without forfeiting credit for acceptance of responsibility); see also United States v. Confredo, 528 F.3d 143, 152 (2d Cir. 2008) (noting that a defendant is free at sentencing to present evidence of his intent regarding the issue of loss after pleading guilty).

In this case, Defendant purposely reserved the issue for sentencing.  Defendant admitted to the factual predicates underlying the criminal offense for which he pleaded guilty and limited the instant challenge to the method of calculation of intended loss utilized by the Government.  This was neither frivolous nor denied on a false basis.  Importantly, Defendant's

guilty plea permitted the Government to forgo preparation of what would likely have constituted a lengthy and factually complex trial.  Therefore, the Court concludes that Defendant is entitled to a downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.

**V.    CONCLUSION**

For the reasons stated above, the Court concludes that U.S.S.G. § 2B1.1(b)(1)(J) applies as Defendant's intended loss was more than $2,500,000 but less than $7,000,000, and that Defendant is entitled to a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1.  An appropriate Order follows.